**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **BHARGAV PATEL,** | : | |
| *Plaintiff* | : | |
| | : | **C.A. No. 25-cv** |
| | : | **Jury Trial Demanded** |
| **v.** | : | |
| | : | |
| **ODIGGO INC., d/b/a SULLY.AI, alias,** | : | |
| **Ahmed Nasser,** *alias***, and** | : | |
| **Ahmed Omar,** *alias,* | : | |
| *Defendants* | : | |

**COMPLAINT**

### I.    Introduction

1.    This action is brought by Plaintiff Bhargav Patel ("Plaintiff") against his former employer, Odiggo Inc. d/b/a Sully.ai, alias ("Defendant"), and its Principals, Ahmed Nasser and Ahmed Omar, seeking compensatory, liquidated, treble, and punitive damages, civil penalties, counsel fees, costs, and other equitable relief for claims arising under the Rhode Island Whistleblowers' Protection Act ("RIWPA"), R.I. Gen. Laws § 28-50-1, *et seq.,* the Rhode Island Payment of Wages Act ("RIPWA"), R.I. Gen. Laws §§ 28-12-1, *et seq.* and 28-14-1, *et seq.,* and the Fair Labor Standards Act ("FLSA) 29 U.S.C. § 201, *et seq.*

2.    While serving in various roles culminating in his appointment as Chief Medical Officer of Defendant Odiggo Inc. d/b/a Sully.ai, Plaintiff performed extensive duties that significantly advanced Defendants' business operations and revenue.

3.    Despite these contributions, Defendants failed to compensate him for months of work, misclassified him as an independent contractor for a period of time, and ultimately terminated his employment after he raised concerns about Defendants' apparent noncompliance with applicable law, including FDA and HIPAA requirements.

**Page 1 of 23**

4. Accordingly, Plaintiff seeks relief hereunder to redress Defendants' unlawful employment practices, including their failure to pay wages for work performed, misclassification of his employment status, and retaliatory termination for complaining about suspected violation of applicable law.

## II. Parties

5. Plaintiff Bhargav Patel is a resident of the City of East Providence, County of Providence, and the State of Rhode Island.

6. Defendant Odiggo Inc., d/b/a Sully.ai, *alias* ("Defendant Sully" or "Sully"), is a foreign corporation, duly incorporated under the laws of the state of Delaware, with a principal office located at 883 North Shoreline Boulevard Suite A100, Mountain View, CA 94043.

7. On information and belief, Defendant Ahmed Nasser, *alias* is a resident of the State of California.

8. On information and belief, Defendant Ahmed Omar, *alias* is a resident of the State of California.

## III. Jurisdiction

9. This United States District Court for the District of Rhode Island has federal subject matter jurisdiction over Plaintiff's claims pursuant to provision of 28 U.S.C. § 1331 because Plaintiff asserts claims arising under federal law, specifically, the FLSA.

10. This Court has supplemental jurisdiction over the state law claims as set forth herein pursuant to 28 U.S.C. § 1367 as they arise out of the same case or controversy.

11. This Court also has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1332 insofar as the amount in controversy between the parties exclusive of interest and costs is significantly greater than $75,000 and there is complete diversity of citizenship between the Plaintiff and Defendants.

12. This Court has specific jurisdiction over Defendants because Defendants have sufficient minimum contracts with the State of Rhode Island, as Defendants are employers that employ Rhode Island residents as defined under the FLSA and the RIPWA, including in particular the Plaintiff, solicit customers in Rhode Island, and do business in Rhode Island.

13. These contacts satisfy federal due process and the Rhode Island long-arm statute requirements, R.I. Gen. Laws § 9-5-33.

### IV.    Venue

14. Venue is proper in this court insofar as a substantial part of the acts or omissions giving rise to this claim occurred in the District of Rhode Island, and the Defendants are subject to personal jurisdiction in the District of Rhode Island, in compliance with the requirements set forth in 28 U.S.C. § 1391.

### V.    Applicable Law

#### *FLSA and RIPWA Liability Allegations*

15. At all relevant times, Defendants were Plaintiff's "employer" within the meaning of 29 U.S.C. § 203(d) of the FLSA and within the meaning of R.I. Gen. Laws §§ 28-12-2(7) and 28-14-1(3) of the RIPWA.

16. Defendants are, and at all relevant times were, engaged in related activities performed through unified operation or common control for a common business purpose, and they are and at all times hereinafter mentioned were an enterprise with the meaning of 29 U.S.C. § 203(r).

17. At all relevant times, Defendants suffered or permitted Plaintiff to work for Defendant.

18.     At all relevant times, Plaintiff was an "employee" of Defendants within the meaning of 29 U.S.C. § 203(e)(1) of the FLSA as well as within the meaning of R.I. Gen. Laws §§ 28-12-2(5) and 28-14-1(2) of the RIPWA.

19.     At all relevant times, Plaintiff, by and through his employment with Defendants, was employed pursuant to Defendants' related activities performed either through unified operation or common control by Defendants for a common business purpose within the meaning of 29 U.S.C. § 203(r).

20.     At all relevant times, Plaintiff by and through his employment with Defendants was "engaged in commerce or in the production of goods for commerce" within the meaning of, *inter alia*, 29 U.S.C. §§ 203 (b), (i)-(j), 206(a), and 207(a), as an employee employed by and performing work for Defendant.

21.     Defendants' business involves developing, marketing, and supporting AI powered medical software for physicians and hospitals across the country and abroad, including in Rhode Island, aimed at increasing physician efficiency and efficacy.

22.     At all relevant times, Defendants' enterprise had annual gross revenues in excess of $500,000.

### VI.     Material Facts

#### *Employment Background*

23.     Plaintiff is a pediatric psychiatrist at Brown University Health.

24.     Plaintiff is a graduate of the Medical College of Georgia, where he won the pediatrics award for compassionate care and was awarded the Carlton Groover trustees scholarship, and has since been steadfastly dedicated to the practice of medicine and increasing access to care for underserved populations.

25. Plaintiff met Defendant Odiggo's CEO, Defendant Ahmed Omar ("Omar"), in May 2023, and in the coming months Defendant Omar and Plaintiff discussed Plaintiff potentially joining Defendants' enterprise.

26. When Defendants recruited Plaintiff, Defendant Omar and Defendants' COO/President, Defendant Ahmed Nasser ("Nasser"), promised Plaintiff that Defendant would create a "win-win" scenario where Plaintiff would be fairly compensated.

27. On or about March 8, 2024, Defendant Nasser messaged Plaintiff stating, "let's get you on whichever role you want, we find the best people in the world working in this field and we let them pick what they want to work on … open to providing any kind of compensation based on your effort/time."

28. Defendants hired Plaintiff on or about March 11, 2024.

29. On or about March 29, 2024, Defendants provided Plaintiff access to the company's Slack platform, used exclusively for work-related communications.

30. From on or about March through November of 2024, Plaintiff worked on average approximately five (5) to ten (10) hours per week for Defendants, and performed a cornucopia of duties, including but not limited to designing ads and scripts that helped Defendants book over five hundred (500) meetings, gathering website testimonials by leveraging his Brown University physician credibility, designing psychiatric note templates, consulting on Defendants' platform, providing marketing and social media advice, and securing clinic subscribers totaling over $15,000 in annual revenue.

31. Plaintiff performed these duties at the request of multiple departments in Defendants' organization.

32.     Plaintiff was also asked to provide and provided advice to Defendants Nasser and Omar and Defendants' employees that resulted in, among other things, corrections to the website and the platform.

33.     All of Plaintiff's advice and work was solicited from Defendants or employees of the company.

34.     During the time Plaintiff was completing these duties, Defendants Nasser and Omar repeatedly promised Plaintiff compensation in the form of either salary or equity.

35.     Most, if not all, of the requests for Plaintiff to perform work related to Defendants enterprise came through the company's private Slack channels.

36.     At no point did Plaintiff complete any of this work on a volunteer basis; he always expected to be compensated based on the fact that he was told by Defendants that they would create a "win-win scenario," and made other statements promising to compensate him.

37.     After diligently performing these duties for about eight (8) months ***without any kind of compensation***, Plaintiff discussed Defendants' failure to compensate him with Defendants Omar and Nasser, asking for fair compensation.

38.     As a result, on or about November 22, 2024, Defendants hired him as Medical Director and began compensating Plaintiff in the amount of $5,000 per month as a purported independent contractor, without benefits.

39.     However, Defendants failed to compensate Plaintiff ***at all*** for all the work performed between on or about March 11, 2024, and November 21, 2024.

40.     Then, on or about January 31, 2025, Defendants started compensating Plaintiff as a W-2 employee, wherein Plaintiff was compensated $5,000 per month plus health benefits and a grant of about $30,000 worth of equity options.

41.     At the same time, Defendants estimated that Plaintiff would be dedicating five (5) to ten (10) hours of work per week for Defendants.

42.     By on or about May 28, 2025, Plaintiff was working for Defendants a minimum of twenty (20) hours per week, often working around thirty (30) hours per week, as a result of which he asked for an increase in his compensation.

43.     In response, Defendants increased Plaintiff's compensation to $10,000 per month on the condition that he bring in $3,000 of "Decision Support" revenue by December 2025.

44.     Decision Support is an add-on, to Defendants' services available for customers to purchase.

45.     Plaintiff was not responsible for direct sales of this product; however, Defendant required him to show he supported the sales team with product promotion, thus generating revenue.

46.     Within a month, Plaintiff's efforts resulted in Defendants securing *almost $40,000 of new Decision Support revenue.*

47.     Accordingly, Plaintiff exceeded his goal several times over, and several months early.

48.     Plaintiff's excellent performance earned him ongoing praise from Defendants, including directly from Defendants Omar and Nasser, who consistently recognized his organizational skills and his ability to bring issues to light that required resolution or improvement.

49.     Plaintiff's excellent performance also earned him a promotion to Chief Medical Officer on or about July 22, 2025.

50.     This promotion came with a salary increase to $14,000 per month and approximately $250,000 worth of equity  in the form of about 79,029 in restricted stock shares.

51.     Around the same time, Plaintiff helped recruit a desperately needed head of engineering, about whom Defendants Omar and Nasser were very excited.

**Page 7 of 23**

52.     This new hire was on track to become Chief Technology Officer and only joined the enterprise because of his friendship with Plaintiff.

53.     Throughout the rest of July, Plaintiff launched a crucial clinical advisory board and continued to meet or exceed all expectations of him, earning him continued praise from Defendant Nasser.

*Whistleblowing Activity*

54.     On or about August of 2025, Plaintiff became concerned about the legality of much of Defendants' operations and raised multiple relevant concerns.

55.     First, Plaintiff witnessed Defendant Nasser brush off compliance concerns on a call with a healthcare network.

56.     Then, on or about August 4, 2025, Plaintiff joined a call with Defendant Nasser and a prospective hospital customer to whom Defendants were attempting to sell an AI radiologist.

57.     Plaintiff was told that the product was basically a ChatGPT wrapper, but on the call, Defendant Nasser claimed Defendants were utilizing an FDA approved AI model.

58.     When the hospital's representative responded that their own research failed to discover the existence of an FDA approved AI radiologist model, Defendant Nasser became upset and abruptly ended the call.

59.     Shortly after the call, Plaintiff complained to Defendant Nasser that it is both criminal and misleading to represent a product as FDA approved when it was not.

60.     Plaintiff also expressed the same concerns to Amit Kumthekar ("Kumthekar"), Defendants' head of research, and a sales team member named Rouhaan.

61.     Plaintiff also expressed the same concerns to co-founder Henry Duong ("Duong"), stating, "I think we should be a little more careful with those things.  Don't want to expose ourselves to legal liability when it comes to compliance/FDA approval type things."

62.    On or about August 10, 2025, Plaintiff followed up on his previous conversation with Defendant Nasser by sending a LinkedIn post describing research that showed human radiologists outperform AI models by a significant margin.

63.    Plaintiff sent the same LinkedIn post to Kumthekar and Rouhaan.

64.    That same day, Kumthekar forwarded Plaintiff an email from Defendants' attorney detailing serious concerns with the ongoing FDA approval process.

65.    In response, Plaintiff expressed serious concerns and complained to Defendants Nasser and Omar, stating, "usually if FDA concerns aren't addressed properly and in time, they post a public warning online which would be a HUGE problem."

66.    In response, Defendant Omar told Plaintiff that this is nothing to worry about and that Plaintiff should not be involved.

67.    As Defendants' Chief Medical Officer, whose licensure and reputation were on the line, Plaintiff was very much "involved" and implicated in the FDA approval and compliance process and in any representations asserted in relation thereto.

68.    The next day, on about August 11, 2025, the head of engineering, who Plaintiff helped recruit, sent a company-wide letter in which he strongly criticized Defendants' culture, explaining that "HIPAA compliance and product capabilities are often overstated," and announced his departure from Defendant after only one (1) week.

69.    Following and in light of the above communication, on that same day, Plaintiff directly complained to Kumthekar about the HIPAA noncompliance of Defendants' product via electronic communication.

### *Termination*

70.    Later that same day, on or about August 11, 2025, at around 10:00 p.m., Defendant Nasser texted Plaintiff asking him to check his email.

**Page 9 of 23**

71.    Plaintiff immediately checked his email and found that he had an email from Defendant Nasser explaining that Plaintiff's employment would be terminated effective immediately.

72.    Defendant Nasser contended that Plaintiff failed to meet performance expectations, stating "you had way long time to improve decision support, the current state of decision support is very bad."

73.    The email also listed Plaintiff's alleged performance goals as follows: "37x better decision support," "50% of user to actively use decision support," "Sully to save 10 patients lives," "help avoid 1000 mistakes for doctors," and "1st user to pay for decision support."

74.    These purported goals that Defendant Nasser identified to justify Plaintiff's separation are demonstrably false and an obvious pretext to justify Plaintiff's unlawful termination.

75.    First, as stated by Defendant Nasser, these were never set goals, but achievements to "aim for" which he proposed on or about the end of January 2025, at or about the time Plaintiff was granted an equity interest in Defendant Odiggo Inc., d/b/a Sully.ai.

76.    Second, these were annual "aims" proposed by Nassar on or about the end of March 2025 to be effective as of the beginning of the second quarter and to be achieved and evaluated after a full year, not less than (5) months.

77.    Third, it is inconceivable that the Defendants would have promoted Plaintiff to Chief Medical Officer on or about July 22, 2025, given him a significant raise and equity, and then terminated him less than three weeks later for poor performance.

78.    Fourth, the "aims" which Nassar is now apparently characterizing as "goals," were either achieved or were vague and/or objectively unobtainable or indeterminable.

79.    For example, the "37x" improvement was vague as to how it would be evaluated; it was also supposed to be evaluated after a full year, not after only a few months.

**Page 10 of 23**

80.     In addition, the "avoid 1000 mistakes" and "save 10 patients lives" goals were impossible to measure or determine, not to mention that Plaintiff had no control over whether the product prevented a physician mistake or saved a life, making this an invalid personal performance metric.

81.     The "50% of users to actively use decision support" goal was actually surpassed because, due to the nature of the product, all users used decision support.

82.     In fact, Defendant shuttered any control Plaintiff may have had over this metric by failing to engineer or launch the Decision Support user interface that Plaintiff designed with the specific intent of increasing physician use.

83.     Other than helping onboard a paying Decision Support customer, which Plaintiff undisputably succeeded in doing, all the remaining "aims" were either unattainable or indeterminable, something even Defendant Nasser had conceded in the past.

84.     Accordingly, when Plaintiff was promoted to Chief Medical Officer and given a raise on or about July 22, 2025, Plaintiff proposed to set third quarter goals that were actually attainable and measurable; a proposition to which Defendant Nasser agreed but never implemented.

85.     Terminating Plaintiff less than three weeks later for allegedly failing to meet these discredited and superseded "goals," which were either unattainable or indeterminable and/or where the ability to achieve them was outside of Plaintiff's control, is clearly a pretext and compelling evidence of wrongful intent.

### *Wage Act Violations*

#### A.     Work Suffered or Permitted

86.     Defendants are liable for the payment of wages for all hours that Plaintiff was "suffered or permitted to work" regardless of whether the work was requested, authorized, or

**Page 11 of 23**

needed—whenever Defendants knew or had constructive knowledge that the work was being performed.

87.    Defendants knew or had reason to believe that Plaintiff was performing work for Defendants between on or about March 11, 2024, and November 21, 2024, because they specifically hired him to do such work and he completed it under their direction and supervision.

88.    Accordingly, Defendants had constructive, if not actual knowledge, that Plaintiff regularly performed work for Defendant by designing ads and scripts that helped Defendant book over five hundred (500) meetings, gathering website testimonials by leveraging his Brown University physician credibility, designing psychiatric note templates, consulting on Defendants' platform, providing marketing and social media advice, and securing clinic subscribers totaling over $15,000 in annual revenue.

89.    Defendants also regularly communicated with Plaintiff about his work during this period, added him to intra-company communication platforms, provided him with a company email, and directed other employees to work with him on certain projects.

90.    Accordingly, Defendants had constructive, if not actual, knowledge that Plaintiff was regularly performing work for them between on or about March 11, 2024, and November 21, 2024.

### B.    Failure to Pay Wages

91.    At all relevant times, Plaintiff was an employee entitled to payment of wages for all hours worked, including minimum wage, under applicable law.  29 U.S.C. § 206; R.I. Gen. Laws §28-12-3 (requiring that employees be paid a minimum wage per hour).

92.    The RIPWA prescribes that every employee shall be paid "***all due wages*** from his or her employer."  *See* R.I. Gen. Laws § 28-14-2.2(a) (emphasis added).

93.    The RIPWA broadly defines the word "wages" as "all amounts at which the labor or service rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, commission basis, or other method of calculating the amount." *See* R.I. Gen. Laws. § 28-14-1(4).

94.    Nevertheless, Defendants willfully and intentionally failed or refused to pay Plaintiff wages for all—or any—hours worked as alleged above herein.[1]

### C.    Defendants Nasser and Omar's Individual Liability

95.    On information and belief, at all relevant times, in his capacity as co-founder, COO, and President of Defendant Odiggo Inc., Defendant Nasser retained and exercised operational control over the business and financial affairs of Defendant Odiggo Inc.

96.    On information and belief, at all relevant times, in his capacity as co-founder and CEO of Odiggo Inc., Defendant Omar retained and exercised operational control over the business and financial affairs for Defendant Odiggo Inc.

97.    On information and belief, at all relevant times, Defendants Nasser and Omar exercised operational control over all aspects of Defendant Odiggo Inc's day-to-day business-related functions.

98.    On information and belief, at all relevant times, Defendants Nasser and Omar were responsible for hiring employees to work at Defendant Odiggo Inc., including Plaintiff.

---

[1] It is black letter law than an employee of a private employer may not "volunteer," in whole or in part, to perform work for his or her employer, insofar as an employee may not waive his or her right to minimum wage and overtime pay due under the FLSA. *See Barrentine v. Arkansas-Best Freight Sys., Inc.,* 450 U.S. 728, 740 (1981); *Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697 (1945). Nor may FLSA rights be abridged, waived, or modified by contract or custom. *See Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 602-03 (1944)("***The Fair Labor Standards Act was not designed to codify or perpetuate those customs and contracts which allow an employer to claim all of an employee's time while compensating him for only a part of it.*** Congress intended, instead, to achieve a uniform national policy of guaranteeing compensation for all work or employment engaged in by employees covered by the Act. Any custom or contract falling short of that basic policy, like an agreement to pay less than the minimum wage requirements, cannot be utilized to deprive employees of their statutory rights.")(emphasis added; footnote omitted).

99.    On information and belief, at all relevant times,  Defendants Nasser and Omar were responsible for paying employees to work at Defendant Odiggo Inc., including Plaintiff.

100.    On information and belief, at all relevant times, Defendants Nasser and Omar developed, directed, and/or implemented all of Defendant Odiggo Inc's employment practices.

101.    On information and belief, at all relevant times, Defendants Nasser and Omar had active control and management over Defendant Odiggo Inc. in relation to the employees working there, including Plaintiff.

102.    On information and belief, at all relevant times, Defendants Nasser and Omar willfully and intentionally created, established, condoned, and enforced a policy or practice whereby Plaintiff was not paid wages for all hours worked, as set forth above.

103.    On information and belief, at all relevant times, Defendants Nasser and Omar knew that Plaintiff was subjected to the above policies and practices.

104.    On information and belief, at all relevant times, Defendants Nasser and Omar had the ability to and did in fact exercise full authority over the above policies, and thereby, among other things, failed or refused to pay Plaintiff all wages owed pursuant to the RIPWA and FLSA.

105.    On information and belief, at all relevant times, Defendants Nasser and Omar are either the sole or partial owners of Defendant Odiggo Inc. and/or otherwise intentionally and/or knowingly profited directly or indirectly from the failure to pay compensation to Plaintiff as alleged herein.

### D.    Failure to Maintain Required Wage Records

106.    On information and belief, Defendants have willfully and repeatedly violated 29 USC §§211(c) and 215(a)(5) of the FLSA by failing to make, keep and preserve adequate and accurate records of Plaintiff's wages, hours, and other terms, conditions, and compensation in

relation to employment as prescribed by regulations duly issued pursuant to authority granted under the FLSA and found in 29 C.F.R. §516.2.

107.    On information and belief, Defendants have willfully and repeatedly violated R.I. the RIPWA by failing to make, keep, and preserve adequate and accurate records of Plaintiff's wages, hours, and other terms, conditions, and compensation in relation to employment as prescribed by said Act.

108.    Defendants have willfully and repeatedly violated R.I. Gen. Laws § 28-14-2.2 of the RIPWA by failing to pay Plaintiff on a weekly or bi-weekly basis.

### *Misclassification*

109.    From approximately on or about November 22, 2024 to January 31, 2025, Defendants classified Plaintiff as an independent contractor.

110.    During this time, Plaintiff was paid $5,000 per month.

111.    During this time, Plaintiff's main assignment was improving UI/UX features of the clinical support piece of the platform.

112.    During this time, Plaintiff was also expected to help with product marketing and growth, which required him to meet with the engineering and sales teams to explain medical concepts or have reference calls with customers.

113.    As a result, during this time, Plaintiff was working approximately twenty (20) hours per week.

114.    Plaintiff only performed design UI/UX work ("work") for Defendants during this time, not for any other company or individual.

115.    Plaintiff utilized Defendant's designated Slack channel with the design agency, the designer, and Defendant Nasser, where they would share design related ideas, suggestions, and comments.

116.    All Plaintiff's design-related communications took place in this channel, giving Defendant Nasser constant oversight over Plaintiff's work.

117.    Plaintiff's services were integrated into and part of the Defendants' Sully.ai work product.

118.    Plaintiff's services were rendered and performed personally by him.

119.    Plaintiff did not hire, supervise, pay, or employ assistants in performance of the work.

120.    Plaintiff provided only his services and did not invest in and/or utilize any of his own specialized tools or equipment to perform the work.

121.    Plaintiff maintained a continuous and unbroken relationship with Defendants in performing the work.

122.    Plaintiff was free to terminate his services and cease performing the work at any time without penalty or liability.

123.    Plaintiff was also required to attend weekly meetings with Defendant Nasser during this period.

124.    Plaintiff did not and could not negotiate his compensation for each component of the work he completed.

125.    Defendants had nearly complete control over Plaintiff's work.

126.    Plaintiff had full direct access to the Sully.ai platform in performing the work.

127.    Plaintiff was paid monthly on a regular and continuous basis for the work.

128.    Accordingly, Plaintiff could not and do not realize a profit or loss from the work performed—he merely received his regular monthly compensation.

129. During this time, Plaintiff did not receive any benefits beyond his monthly compensation, nor was he covered by state unemployment insurance, state temporary disability insurance, or worker's compensation insurance.

130. Furthermore, during this time, Defendants did not contribute to payroll taxes during this time.

131. When Defendant switched Plaintiff to a W-2 employee on or about January 31, 2025, Plaintiff's duties did not change, demonstrating that Defendants knew or should have known that Plaintiff's work duties at all times required classifying him as an employee and not as an independent contractor.

132. Accordingly, Defendants misclassified and unlawfully paid Plaintiff as an independent contractor and issued him an IRS Form 1099, when he should have been paid wages as an employee and annually issued an IRS Form W-2, in violation of, *inter alia,* R.I. Gen. Laws § 28-14-19.1, for which Plaintiff is entitled to relief under R.I. Gen. Laws § 28-14-19.2.

### *Rhode Island Whistleblowers' Protection Act Violation*

133. The Rhode Island Whistleblowers' Protection Act prohibits an employer from taking adverse action, including termination, against an employee "[b]ecause the employee reports verbally or in writing to the employer or to the employee's supervisor a violation, which the employee knows or reasonably believes has occurred or is about to occur, of a law or regulation or rule promulgated under the laws of this state, a political subdivision of this state, or the United States […]." R.I. Gen. Laws § 28-50-3(4).

134. As described above, Plaintiff was subjected to adverse employment action when Defendants terminated his employment after he complained about Defendants' failure to comply with applicable law, specifically including FDA and HIPAA laws and regulations.

**Page 17 of 23**

135.    On or about August 4, 2025, after receiving an email from Defendants' attorney regarding FDA approval issues and concerns, Plaintiff complained to Defendant Nasser that failing to comply could be a significant compliance issue for Defendant Sull.ai.

136.    Failing to comply with the FDA processes and requirements would be a violation of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq*, and FDA regulations, 21 C.F.R. § 1, *et seq*.

137.    On or about August 10, 2025, Plaintiff complained to Defendant Nasser that representing a product as FDA approved when it is not would be illegal.

138.    The next day, on or about August 11, 2025, the same day he was terminated, Plaintiff complained about Defendants' possible HIPAA noncompliance, which would be a violation of various provisions of HIPAA as provided under 45 C.F.R. 160, *et seq*, 45 C.F.R. 162, *et seq*, and 45 C.F.R 164, *et seq*.

139.    That the Defendants were motivated to take adverse action against the Plaintiff due to his complaints of FDA and HIPAA noncompliance and other unlawful conduct may be inferred, in part, by evidence that Defendants' reasons for terminating Plaintiff were false and pretextual, including: a) the temporal proximity of the protected conduct to the adverse action; b) the sudden emergence of alleged work performance issues; c) Plaintiff's excellent performance history; d) asserting false justifications for Plaintiff's termination; e) implausibilities, inconsistencies, incoherencies, or contradictions in the justification for Plaintiff's termination; and, f) the lack of any warnings related to Plaintiff's alleged deficient performance.

140.    In light of Plaintiff's qualifications and work performance, but for Defendants' unlawful retaliatory conduct, Plaintiff would not have been terminated.

*Pattern and Practice*

141.    On information and belief, Defendants have exhibited a pattern of engaging in the same or similar unlawful conduct as that complained of herein above.

142.    Defendants terminated at least three other employees who raised concerns about legal noncompliance.

143.    Employee Dipak Patel was demoted and then forced out of his position after complaining about HIPAA noncompliance with Defendants' product.

144.    Employee Harris Gordon was also fired for alleged "negativity" the day after communicating two concerns of HIPAA noncompliance to leadership after receiving customer complaints regarding the same.

145.    Mr. Gordon's supervisor and Head of Customer Success, Ted Lichtenberger, was terminated the day after Mr. Gordon, because he forwarded Mr. Gordon's complaints of HIPAA noncompliance to leadership and subsequently endorsed Mr. Gordon's complaints.

146.    Defendants failed to pay at least two other employees who performed work for and on behalf of the Defendants: Jackson Bell and Dr. Ahmed Khan performed advisory work for Defendants for several months and were never compensated.

*Harm*

147.    At all relevant times, Defendants acted intentionally, willfully, maliciously, and/or with reckless or callous indifference to Plaintiff's clearly established statutory, common law, and/or contractual rights.

148.    At all relevant times, Defendants were motivated by malice, wantonness, or willfulness of such an extreme nature as to amount to criminality.

149.    As a proximate result of Defendants' concerted acts and/or omissions, including but not limited to those described herein, Plaintiff has suffered, is now suffering, and will continue to

suffer pecuniary losses, loss of income, loss of front and back pay, loss of employment benefits, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, damage to his professional and personal reputation, and has incurred and will continue to incur expenses for legal services, and other great harm.

## Claims for Relief

150.    Plaintiff incorporates the allegations in paragraphs 1 through 149 above in each of the counts set forth below

### Count One
#### *Fair Labor Standards Act*
#### *29 U.S.C. § 201, et seq.*
#### Failure to Pay Wages

151.    Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to, those described herein, violated the FLSA by failing to pay wages for all hours worked, including minimum wage, as provided herein, thereby causing Plaintiff to suffer damages as aforesaid, for which Plaintiff is entitled to relief pursuant to 29 U.S.C. § 216(b).

### Count Two
#### *Rhode Island Payment of Wages Act*
#### *R.I. Gen. Laws §§ 28-12-1 et seq.* **and 28-14-1** *et seq*
#### Failure to Pay Wages

152.    Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to, those described herein, violated the RIPWA by failing to pay wages for all hours worked as provided herein, thereby causing Plaintiff to suffer damages as aforesaid, for which Plaintiff is entitled to relief pursuant to R.I. Gen. Laws § 28-14-19.2 and § 28-14-20.

## Count Three
### *Misclassification in Violation of R.I. Gen. Laws § 28-14-19.1*

153.    Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to, those described herein, misclassified Plaintiff in violation of R.I. Gen. Laws § 28-14-19.1, thereby causing Plaintiff to suffer damages as aforesaid, for which Plaintiff is entitled to relief pursuant to R.I. Gen. Laws § 28-14-19.2.

## Count Four
### *Common Law Breach of Contract*

154.    In the alternative to Counts One, Two, and Three above and Count Five below, Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to, those described herein, breached the contract entered into with Plaintiff to pay compensation for services rendered, thereby causing Plaintiff to suffer damages as aforesaid, for which Plaintiff is entitled to relief under the common law of the State of Rhode Island.

## Count Five
### *Quantum Meruit*

155.    In the alternative to Counts One, Two, Three, and Four above, Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to, those described herein, are liable to the Plaintiff for the reasonable value of all unpaid work Plaintiff performed for and on behalf of Defendants by which Defendants benefited and were enriched, thereby causing Plaintiff to suffer damages as aforesaid, for which Plaintiff is entitled to relief under the common law of the State of Rhode Island.

## Count Six
### *Rhode Island Whistleblowers' Protection Act*
### *R.I. Gen. Laws § 28-50-1 et seq.*
### Whistleblower Retaliation

156.    Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to, those described herein discriminated against and discharged Plaintiff in violation

of the RIWPA and thereby deprived Plaintiff of rights secured under the RIWPA, causing Plaintiff to suffer damages as aforesaid, for which Plaintiff is entitled to relief pursuant to R.I. Gen. Laws §§ 28-50-4 and 5.

## VII.    Prayers for Relief

**WHEREFORE,** Plaintiff prays that this Honorable Court grant the following relief:

1. A declaratory judgment declaring that the acts and/or omissions of Defendants, including but not limited to those complained of herein, violated the FLSA, the RIPWA, and the RIWPA;

2. An injunction directing Defendants to take such affirmative action as is necessary to refrain from such conduct as is necessary to ensure that the effects of these unlawful employment practices are eliminated and not repeated;

3. An award of unpaid wages and benefits;

4. An award of compensatory damages;

5. An award of actual damages;

6. An award of liquidated damages pursuant to 29 U.S.C. § 216(b);

7. An award of liquidated damages of two (2) times the amount of wages or benefits owed pursuant to R.I. Gen. Laws §§ 28-14-19.2 and 28-14-20;

8. An award of treble damages pursuant to R.I. Gen. Laws § 28-50-4;

9. An award of a civil penalty pursuant to §§ 28-14-19.1;

10. An award of reasonable attorney's fees and costs of litigation pursuant to 29 U.S.C. § 216(b), and R.I. Gen. Laws §§ 28-14-19.2, 28-14-20, and 28-50-4;

11. An award of other appropriate equitable relief pursuant to 29 U.S.C. § 216(b) and R.I. Gen. Laws §§ 28-14-19.2 and 28-50-4; and,

12. An award of such other further relief as this Honorable Court deems just and proper.

## VIII.    Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all counts so triable.

## IX.    Designation of Trial Counsel

Plaintiff hereby designates Richard A. Sinapi, Esq. and Jonathan C. Sanders, Esq. as trial counsel.

Plaintiff,
**Bhargav Patel**
By his attorneys,
**SINAPI LAW ASSOCIATES, LTD.**

**Dated: November 25, 2025**

**/s/ Richard A. Sinapi**
**Richard A. Sinapi, Esq.  (#2977)**
**Jonathan C. Sanders, Esq.  (#11040)**
2374 Post Rd. Suite 201
Warwick, RI 02886
Phone: (401) 739-9690; FAX: (401) 593-9040
Email: ras@sinapilaw.com;  jcs@sinapilaw.com